## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

BLESSING N. IGWE,                          )
                                           )
                    Plaintiff,             )
vs.                                        )          NO.  CIV-10-0474-HE
                                           )
SAINT ANTHONY'S HOSPITAL,                  )
                                           )
                    Defendant.             )

## ORDER

Plaintiff Blessing N. Igwe filed this action against her former employer, Saint Anthony's Hospital ("SAH"), asserting claims under Title VII, § 1981 and state law. She alleges SAH discriminated against her on the basis of race and national origin and also retaliated against her in violation of federal law and Oklahoma public policy. She also asserts state claims for workers' compensation retaliation and tortious interference with business relations. Defendant has moved for summary judgment, which is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The court has viewed the evidence and any reasonable inferences that might be drawn from it in the light most favorable to plaintiff, the nonmoving party, and concludes defendant's motion should be granted as to all claims.

## Background

Plaintiff, who was born in Nigeria, began working as a registered nurse at SAH in July 2004. She was promoted to Charge Nurse in the Child Adolescent Residential Unit

("CARU") in August 2005.[1] On February 9, 2006, plaintiff received a written warning from Phyllis Thomas, her manager, for unsatisfactory work performance and difficulties with her coworkers. She had no further discipline problems until June 9, 2008, when Margaret Martin, who became plaintiff's supervisor in January 2008, issued her a written disciplinary action for violating the hospital's weapon's policy.[2] At that time plaintiff was the only black Charge Nurse supervised by Ms. Martin. Plaintiff met with Ms. Martin and Amy Boyd, the Director of Behavioral Medicine, on June 10, 2008, to discuss the disciplinary action. She memorialized the meeting by a letter delivered to Ms. Boyd dated June 12, 2008. In that letter, defendant's Exhibit 7, plaintiff stated that while she felt she had substantially complied with the weapons policy, she accepted Ms. Martin's interpretation of it and was not complaining about the discipline itself. Her concerns were that the "written warning" box was checked on the disciplinary action report after she had signed the document, that a written warning was not procedurally correct because she had not had a prior verbal warning, and that a peer improperly witnessed the disciplinary action. Plaintiff also felt Ms. Martin had discriminated against her by verbally warning her about clocking-in early. Plaintiff asserted that, although clocking-in early was a widespread practice, Ms. Martin "had not cited any of the other employees, either verbally or otherwise ...." Defendant's Exhibit 7. [3]

---

[1]*Children from ages eight to twelve who have mental health issues are in the CARU.*

[2]*The infraction had to do with plaintiff's failure to tell an armed visitor, a policeman, to either lock his gun in his car or have hospital security put it in a lock box until he left the hospital unit. The incident occurred on June 5, 2008. The Disciplinary Action Report is dated June 9, 2008.*

[3]*Defendant offered evidence to the contrary. See defendant's Exhibit 15.*

On June 13, 2008, defendant changed the report to reflect that the warning was verbal, rather than written.[4]

Plaintiff met again with Ms. Boyd and Ms. Martin on June 13, 2008, to discuss plaintiff's allegations of disparate treatment. The parties planned to meet again to attempt to resolve plaintiff's issues and concerns. Defendant's Exhibit 8. In anticipation of that meeting, plaintiff sent Ms. Boyd a letter, dated June 17, 2008, in which she "detailed a history of specific instances of what [she] believe[d] to be examples of disparate treatment by [her] manager, Margaret Martin." *Id.* She complained that Ms. Martin had denied her request to take both three days of leave in May 2008, and two weeks the following August. Plaintiff claimed Ms. Martin told her that she had not worked at the hospital long enough to take more than 80 hours of paid leave that year. She stated that she did not find such a limitation in the hospital's leave policy and was aware that RN's and other employees frequently took more than two weeks' leave during the year. Plaintiff also wrote that Ms. Martin had singled her out when she told plaintiff to stop clocking in early. Plaintiff stated that while Ms. Martin knew that two other Charge Nurses had been doing the same thing for a significant period of time, she had not disciplined them. She also asserted that Ms. Martin

---

[4]*Plaintiff testified that Ms. Martin had initially issued a written warning regarding the violation of the weapons policy because she thought she had previously issued plaintiff a verbal warning regarding clocking-in early. Plaintiff stated that Ms. Boyd informed Ms. Martin that the verbal warning was not "correct discipline," Plaintiff's Exhibit 1, p. 169, as she had not documented the oral warning in writing. SAH apparently had a progressive discipline policy that required each step, including an oral warning, to be documented in writing. The parties' dispute as to whether Ms. Martin issued "plaintiff a disciplinary action for clocking in early," defendant's fact statement #12, is immaterial as it did not ultimately affect the level of discipline she received for violating the weapons policy.*

had ignored the repeated tardiness of another employee and that, despite repeated requests to Ms. Martin, she had not received a password for the hospital's At-Staff computer program, while the other Charge Nurses on Ms. Martin's team, and another Charge Nurse hired after her, had been given their passwords. Finally, plaintiff mentioned that Ms. Martin had indicated to her that she relied on the opinion of plaintiff's former supervisor when evaluating plaintiff in March 2008, and, in conjunction with the June 9, 2008, discipline had inaccurately and/or falsely told plaintiff she had several disciplinary actions in her personnel file. Ms. Boyd and Ms. Martin met with plaintiff on June 18, 2008, regarding her concerns. The next day Ms. Martin sent a memo to Ms. Boyd and Cynthia Brundige, in SAH's human resources department, responding to the allegations in plaintiff's June 12 and June 17 letters.

Ms. Boyd subsequently sent plaintiff a letter dated June 23, 2008, in which she stated that she had met with Cynthia Brundige from SAH's Human Resources Department and they would investigate the issues raised in plaintiff's letter and respond in writing. In a letter to plaintiff dated July 17, 2008, Ms. Boyd addressed each item listed in plaintiff's June 17, 2008, letter. Defendant's Exhibit 10. She concluded with: the "investigation into the matters raised in our meeting and in your two letters does not substantiate that you have been subjected to disparate treatment."[5] Plaintiff testified that she did not receive Ms. Boyd's

---

[5]*Ms. Boyd noted that many of plaintiff's concerns related to conversations she had had with Ms. Martin, whose recollection of the discussions differed from plaintiff's, but plaintiff had not provided any witnesses to those conversations.*

letter while employed at SAH.[6]

In December, 2008, a patient's mother complained that plaintiff had been rude to her on two occasions. Ms. Boyd filed a report regarding the complaint, dated December 15, 2008, in which she detailed what the mother said and stated that she had discussed the complaints with plaintiff, who denied she had been rude. A couple of weeks later the mother of a minor patient, J.T., complained to the child's therapist that she had not been informed that J.T. had been placed in a therapeutic hold[7] on December 27, 2008.[8] Ms. Martin reported the incident, as required, to the State Office of Client Advocacy ("OCA").[9]

SAH personnel follow certain procedures in conjunction with the use of a therapeutic hold on a CARU patient. If a patient engages in violent or self-destructive behavior, the

---

[6]*Plaintiff stated she received a copy of it from the Equal Employment Opportunity Commission.*

[7]*As explained by plaintiff ,a therapeutic hold is used in an emergency situation to immobilize a patient who is exhibiting violent or destructive behavior towards himself or others. A bear hug is an example of a therapeutic hold. Plaintiff's Exhibit 1, pp. 95-98.*

[8]*Plaintiff asserted in her response to defendant's fact statement #19 that the "OCA [Office of Client Advocacy] Report reveals that JT was not placed in a hold on December 27, 2008. An area of concern noted in the Report was that JT sustained bruising to his upper left arm, which was not consistent with the authorized CAPE hold that was used. There was no documentation of the hold or of the injury sustained." Plaintiff's response brief, p. 5. Plaintiff's response is inaccurate. The investigation summary states that "[o]n 12-27-08, at least one therapeutic hold was initiated on Resident [J.T.]." Defendant's Exhibit 12, p. 1.*

[9]*State law requires that a person having reason to believe that a minor has been abused or neglected is required to promptly report it to the Oklahoma Department of Human Services. 10A Okla. Stat. § 1-2-101(B). J.T. had sustained "several little bruises on the inner part of his upper right arm that appeared consistent with fingerprints." Defendant's Exhibit 12, p. 2. Plaintiff does not claim the incident should not have been reported or that the reporting, itself, was discriminatory towards her.*

Mental Health Technician ("MHT") notifies the Charge Nurse, who assesses the patient and intervenes. If the patient cannot be calmed down, the Charge Nurse calls the doctor and then follows his instructions, writing the order in the patient's chart. If the patient continues the behavior a hold may be performed. The Charge Nurse is supposed to supervise the hold if she is available. She also is responsible for documenting any hold of which she is aware – she makes sure the MHT correctly fill out forms provided for that purpose and then reviews and signs the forms. The MHT may, in certain circumstances, have to engage in a hold without giving prior notice to the Charge Nurse. When that happens the MHT still has to inform the Charge Nurse that a hold was placed on a patient. If a hold occurs that was not ordered by the doctor, the Charge Nurse notifies the doctor and gets an order, after the fact, for the hold. Plaintiff's Exhibit 1, pp. 86-97.

The OCA conducted an investigation regarding the hold placed on J.T., interviewing J.T., plaintiff, Ms. Boyd, Ms. Lovick, Ms. Martin, Melissa Sanders-Ezell, a Recreational Therapist, and Deadra Stamps and Jimmy Ezell, MHT's. The last three individuals were on duty with plaintiff on December 27, 2008. The OCA investigated whether plaintiff and Mr. Ezell engaged in caretaker misconduct.[10] Plaintiff denied any knowledge of the hold or that she had been asked for assistance regarding J.T. on December 27. The OCA issued its report on March 4, 2009, in which it determined:

There [was] sufficient evidence to  support a finding of caretaker misconduct

---

[10]*The summary of the OCA investigation is taken from defendant's fact #23, which plaintiff did not dispute, and the OCA Report, defendant's Exhibit 12.*

by RN Igwe. On 12-27-08, at least one therapeutic hold was initiated on Resident [J.T.]. MHT Ezell conducted the hold which was witnessed by MHT Stamps and verified by [J.T.]. Igwe failed to respond to a request for assistance and did not monitor or document the evening restraint as required by facility policy. At a minimum, Igwe should have responded to the ongoing commotion and escalating behaviors which ultimately led to [J.T.] being restrained.

Defendant's Exhibit 12, p. 1. While the OCA found caretaker misconduct by plaintiff, it concluded that "[t]he evidence [was] insufficient to support a finding of caretaker misconduct by MHT Ezell." *Id.* at 4. The agency stated in its report that:

Based on [MHT Ezell's] request for assistance and the statements by other staff, it is apparent Ezell's needs went unassisted. Resident [J.T.] had been acting out throughout the day and it was not possible to determine if his injury was the result of this hold or other actions. Ideally, Ezell and other staff should have addressed their concerns with RN Igwe's performance prior to an incident occurring.

*Id.*

Defendant's records did not reflect that the staff had problems with J.T. on December 27, 2008, or that Ezell asked plaintiff for assistance. Plaintiff testified that if the situation involving J.T. that was described in her termination papers[11] had actually occurred, numerous documents would have been generated and placed in J.T.'s file, including a Violent/Self-Destructive Behavior Restraint/Seclusion Flowsheet and a Behavioral Medicine Treatment Plan Form.

SAH's discipline policies are divided into three categories of rules, Groups I-III. A

---

[11] *A memorandum was attached to plaintiff's March 19, 2009, final disciplinary report. Defendant's Exhibit 14.*

Group III Rule violation includes "any action or neglect which results or could have resulted in placing the recovery of a patient in jeopardy, as determined by competent personnel."[12] A violation of a Group III Rule results in immediate termination.[13] Defendant's Exhibit 13. SAH terminated plaintiff on March 19, 2009 for violating several disciplinary rules, including the Group III Rule prohibiting behavior that jeopardized or could have jeopardized a patient's recovery. Defendant's Exhibit 14. Defendant relied on the OCA report in making its decision to fire plaintiff.[14] Plaintiff disputes the OCA's findings, insisting that to her knowledge there was no hold and the bruising on J.T. that led to the investigation resulted from Ezell pinching him.[15] Plaintiff's Exhibit 1, pp. 272-276.

On February 3, 2009, before she was discharged, plaintiff was injured at work by a patient and was placed on light duty by her physician. In January 2010, plaintiff applied for a position with OU Medical Center. She claims she was not hired because SAH gave her a bad reference.

---

[12]Neither party provided a copy of defendant's disciplinary rules. Plaintiff did not challenge defendant's recitation, in fact statement #25, of the pertinent Group III Rule or the discipline imposed for its violation. She objected to defendant's fact #25 on the basis that she "did not violate Defendant Group III Rule." Plaintiff's response, p. 5. She asserts that "Jimmy Ezell violated Defendant's Group III Rule, but he was not disciplined." Id. See plaintiff's Exhibit 1, p. 62.

[13]Plaintiff agreed that a Charge Nurse could place the recovery of a patient in jeopardy by refusing to assist in a hold and that such action would be Group III violation justifying termination. Plaintiff's Exhibit 1, pp. 285-86.

[14]Plaintiff does not dispute that defendant relied on the OCA report, but contends that under Staub v. Proctor Hosp., ___ U.S. ___ , 131 S.Ct. 1186 (2011) such reliance does not shield SAH from liability for "its unlawful discriminatory actions." Plaintiff's response, p. 6.

[15]Plaintiff testified that she concluded after she was terminated that the bruising was caused by Ezell pinching J.T. Plaintiff's Exhibit 1, pp. 276-77.

**Analysis**

Plaintiff relies on the McDonnell Douglas[16] analytical framework to establish her Title VII and § 1981 discrimination claims.[17]

Discriminatory discharge

To establish a prima facie case of termination on the basis of race or national origin,[18] a plaintiff must show that: (1) she belongs to a protected class; (2) she was qualified for the job; (3) despite her qualifications, she was discharged; and (4) the job was not eliminated after her discharge. Baca v. Sklar, 398 F.3d 1210, 1216 (10th Cir. 2005).[19] Once she makes

---

[16]McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973). "The McDonnell Douglas burden-shifting analysis is appropriate in ... discrimination cases such as the present one, in which the plaintiff has no direct evidence of discrimination and the employer disclaims reliance on the plaintiff's [race] for an employment decision." Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 n.3 (10th Cir. 1997).

[17] "[I]n racial discrimination suits, the elements of a plaintiff's case are the same, based on the disparate treatment elements outlined in McDonnell Douglas, whether that case is brought under §§ 1981 or 1983 or Title VII." Drake v. City of Fort Collins, 927 F.2d 1156, 1162 (10th Cir.1991); accord Baca v. Sklar, 398 F.3d 1210, 1218 n.3 (10th Cir. 2005).

[18] In its motion for summary judgment defendant challenged plaintiff's race discrimination claims on the basis she could not show disparate treatment. Plaintiff had alleged in the complaint that she was "subjected to disparate treatment based on her race and national origin." Complaint, Count I. In her response brief plaintiff now argues that she is asserting claims for discriminatory discharge based on race and national origin. Defendant did not, in its reply brief, raise any issue based on this change in the description of plaintiff's claim but focused instead on its argument that plaintiff had not rebutted its proffered legitimate, nondiscriminatory reason for terminating her.

[19]The elements of a prima facie case have been stated in a variety of sometimes inconsistent ways and the standard is, in any event, flexible and may vary depending on the context of the claim and the nature of the adverse action involved. Adamson v. Multi Community Diversified Servs., Inc., 514 F.3d 1136, 1150 (10th Cir. 2008); see also Plotke v. White, 405 F.3d 1092 (10th Cir. 2005). However, as defendant does not assert plaintiff failed to establish a prima facie case, it is unnecessary to belabor the issue here.

a prima facie showing, the burden shifts to the employer to state a legitimate, nondiscriminatory reason for its adverse employment decision. If the employer meets this burden, then summary judgment is warranted unless the employee shows there is a genuine dispute of material fact as to whether the proffered reason was pretextual or not worthy of belief.  Green v. New Mexico, 420 F.3d 1189, 1192 (10th Cir. 2005).

Although defendant did not challenge whether plaintiff had established presented a prima facie of discriminatory discharge,[20] the hospital did articulate a legitimate, nondiscriminatory reason for plaintiff's discharge – it concluded, relying on the findings of the OCA, that plaintiff had violated a Group III disciplinary rule.[21]  The question therefore becomes whether plaintiff has presented evidence sufficient to create a justiciable issue as to whether defendant's proffered reason is pretextual.

"Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."[22]  Morgan v.

---

[20]See supra note 18.

[21]Other rule violations were cited by defendant in plaintiff's discharge papers, but the principal reason for her termination was her violation of a Group III Rule based on the OCA's determination of caretaker misconduct.

[22]Pretext also may be shown by "prior treatment of [the] plaintiff; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating hiring criteria); and the use of subjective criteria." Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1328 (10th Cir.1999).

Hilti, Inc.,108 F.3d 1319, 1323 (10th Cir. 1997) (internal quotations omitted).

> A plaintiff typically makes a showing of pretext in one of three ways: (1) with evidence that the defendant's stated reason for the adverse employment action was false, *see, e.g.*, Cole v. Ruidoso Mun. Sch., 43 F.3d 1373, 1380-81 (10th Cir. 1994) (finding that evidence supporting the conclusion that the defendant's reason for the nonrenewal of plaintiff's employment contract was false was sufficient for plaintiff to survive summary judgment); (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances, *see, e.g.*, Mohammed v. Callaway, 698 F.2d 395, 400-01 (10th Cir. 1983) (finding that departure from employment criteria set out in job announcement so as to disadvantage minority employee seeking promotion was probative of discrimination); or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff.

Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1230 (10th Cir. 2000).

Plaintiff claims the hospital's prior discriminatory treatment of her constitutes evidence that defendant's stated reason for her termination is false. Citing Staub v. Proctor Hosp., ___ U.S. ___, 131 S.Ct. 1186 (2011), she argues that the hospital cannot avoid liability by relying on the OCA's findings as justification for its decision to terminate her. However, Staub is distinguishable. There the Supreme Court considered the "cat's paw" theory, holding that "if a [subordinate] supervisor performs an act motivated by [discriminatory] animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable ...." Staub, ___ U.S. at ___, 131 S.Ct. at 1194. Here, SAH is not arguing that someone other than the person accused of discriminating against plaintiff made the

termination decision.[23]  Rather, defendant is asserting that its proffered reason for plaintiff's termination was not pretextual as it was based on the results of an investigation conducted by an independent state agency.

Although prior discriminatory treatment may be evidence of pretext, plaintiff has failed to offer sufficient evidence to create a triable dispute for the jury.  She asserts in her response that

> Margaret Martin harbored a bias against Plaintiff.  This is evident by her memos and prior treatment of Plaintiff.  Martin's memos (See Pltf's Ex. 2, June 19, 2008, memos from Margaret Martin) are circumstantial evidence of discriminatory animus and coupled with the subjective decision to terminate Plaintiff, a reasonable jury could conclude that these memos were related to the discipline and termination decision.

Plaintiff's response, p. 16.[24]  While the memos surely reflect that Ms. Martin contested plaintiff's accusations, there is nothing in Ms. Martin's responses to warrant an inference of discriminatory animus based on race or national origin.[25]

---

[23]*Although the parties do not identify the decision maker, Ms. Martin signed the Disciplinary Action Report.  Defendant's Exhibit 14.*

[24]*Only Ms. Martin's memos have been considered in determining whether SAH's treatment of plaintiff demonstrates pretext. Without further explanation, plaintiff's general reference to "prior treatment" is insufficient to allow the court to determine whether some reason other than plaintiff's violation of SAH's Group III Rules led to her discharge. While defendant spent a considerable part of its brief discussing various incidents of alleged disparate treatment, plaintiff did not.  See supra note 18.  Even if they had been considered, plaintiff failed to show she was treated differently than other employees because of her race or national origin.*

[25]*In conjunction with her assertion that Ms. Martin's memos demonstrate discriminatory animus, plaintiff cites* Ash v. Tyson Foods, Inc., *546 U.S. 454, 456 (2006) (per curiam) with the following parenthetical description: "holding that use of potentially derogatory terms may be evidence of racial animus which could potentially show pretext, depending on various factors including context."  Plaintiff's response, p. 16.  Yet plaintiff does not point out any "potentially derogatory terms" in Ms. Martin's memos and the court found none.*

Plaintiff also attempts to show that defendant acted contrary to an unwritten policy or company practice "by providing evidence that [s]he was treated differently from [an]other similarly-situated employee[] who violated work rules of comparable seriousness." Kendrick, 220 F.3d at 1230. She claims that Ezell was similarly situated to her and, even though he was the one who bruised the child and failed to chart the abuse, he "was **not** subjected to the same requirements and discipline as Plaintiff." Plaintiff's response, p. 15.

There are several problems with plaintiff's argument. First, plaintiff was not "similarly situated to [Ezell] in all relevant respects."[26] McGowan v. City of Eufala, 472 F.3d 736, 745 (10th Cir. 2006). "Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline." *Id.* (internal quotations omitted). Plaintiff was the Charge Nurse and Ezell was the mental health technician. Their job levels and job responsibilities were different; she was in a supervisory position. While techs may be "required to chart every incident that occurs and all activities," plaintiff's response, p. 7, plaintiff was not a tech. *See* McGowan, 472 F.3d at 745 ("Although they both reported to Osmond and monitored prisoners in the City jail, their jobs that night were very different. Dawson was the booking officer, while McGowan was the jailer.").

Second, even if plaintiff and Ezell were similarly situated, they "must have been disciplined for conduct of 'comparable seriousness' in order for their disparate treatment to

---

[26]*As Ezell also was an African American, plaintiff could not rely on defendant's failure to discipline Ezell as evidence of race discrimination.*

13

be relevant." *Id.* (quoting <u>Kendrick v. Penske Transp. Servs., Inc.</u>, 220 F.3d 1220, 1230 (10th Cir. 2000). Plaintiff asserts that Ezell was not disciplined. However, the OCA found plaintiff, but not Ezell, had committed caretaker misconduct. While Ezell admitted he did not complete the required paperwork,[27] plaintiff did not show that a MHT's failure to document a hold is a terminable offense under SAH's discipline policy. While she asserts he admitted bruising J.T., citing his statement, plaintiff's Exhibit 5, and the OCA report, neither document supports her assertion.[28] She cannot rely on her own testimony that he admitted to her that he had bruised J.T., because defendant has correctly challenged it as inadmissible hearsay.[29] *See* <u>McGowan</u>, 472 F.3d at 471 ("To determine whether genuine issues of material fact exist for the jury, the court may consider only the evidence that would be available to the jury.") (internal quotations omitted). "In sum, because [plaintiff] and [Ezell] were (1) not performing the same job, (2) not subject to the same policies, statutes and findings of wrongdoing, and (3) different in their relative level of culpability, they were not

---

[27]In his statement in the OCA report, Ezell stated that "a debriefing form was not brought to him after the hold and he assumed Igwe had filled it out while he processed with [J.T.]." *Defendant's Exhibit 12, p. 10.* In the unauthenticated statement attached attached as Exhibit 5 to plaintiff's response, Ezell gives a similar explanation for his failure to document the hold: "I thought the nurse was filling out the paperwork for hold but never received paperwork to sign and so I didn't note problem in my charting." *Plaintiff's response, Exhibit 5.*

[28]Ezell did not refer to J.T.'s bruises in his statement and the OCA report concluded that "Resident [J.T.] had been acting out throughout the day and it was not possible to determine if his injury was the result of this hold or other actions." *Defendant's Exhibit 12, p. 4.* That was consistent with the later statement under Area(s) of Concern that J.T. had sustained bruising to his arm which was "not consistent with the authorized CAPE hold that was used." *Id. p. 5.*

[29]Even if plaintiff's statement is considered and it is assumed Ezell bruised J.T., plaintiff has not shown that he should have been terminated. The bruising could have resulted because Ezell was unable to get the assistance he needed to place J.T. in a proper hold.

14

similarly situated.  Additionally, even if they were similarly situated, [plaintiff's] conduct was not sufficiently similar to [Ezell's] to allow an inference of pretext on the basis of their disparate treatment." *Id*. at 745-56.

The crux of plaintiff's argument is that she disputes the OCA findings that she, and not Ezell, committed caretaker misconduct.  However, "a challenge of pretext requires a court to look at the facts as they appear to the person making the decision to terminate, not the aggrieved employee." Green, 420 F.3d at 1191 n.2.  Plaintiff has not met her burden of pointing to some admissible evidence showing that SAH's proffered explanation for her termination is mere pretext.  Defendant  is entitled to summary judgment on her discriminatory discharge claims under Title VII, §1981 and state law.[30]

Retaliation

Defendant challenged plaintiff's retaliation claims, asserted under Title VII, § 1981 and state law, on the grounds she (1) could not show a causal connection between her complaints of discrimination while employed at SAH and her termination and (2) had not offered admissible evidence demonstrating that SAH gave her a bad job reference in retaliation for filing a complaint with the EEOC.  Plaintiff ignored the hearsay objection raised by defendant as to the testimony offered in support of the latter ground, but otherwise contended that "causation is established by additional evidence showing that shortly after she filed her internal complaint, Defendant began a retaliatory campaign designed to ultimately

_____

[30]*Plaintiff's public policy (Burk tort) claims for discriminatory discharge fail due to the same evidentiary deficiency that precludes her federal claims.*

terminate her employment."  Plaintiff's response, p. 12.  Such unsubstantiated, conclusory

allegations are insufficient to demonstrate causation.    Plaintiff's other argument directed

to causation consists of her statement that "Defendant's termination of Plaintiff in reliance

on the OCA Report satisfies the causation requirement."  *Id.* at p. 13.   While it is unclear

what plaintiff means, it is clear that she has not offered any evidence linking either her

termination or the alleged bad job reference to protected activity.

Workers' Compensation retaliation

In addition to claiming she was terminated on the basis of her race and national origin,

plaintiff asserts defendant fired her in retaliation for filing a workers' compensation claim.

The Oklahoma Workers' Compensation Act ("Act") prohibits any "person, firm, partnership,

corporation or other entity [from] discharg[ing] ... any employee because the employee has

in good faith ...[f]iled a claim [or] ... [i]nstituted or caused to be instituted any proceeding

under the [Workers' Compensation Act]." 85 Okla. Stat.§ 5(A)(1), (3).  To establish a prima

facie case under this statute a plaintiff must demonstrate: (1) employment; ( 2) an on-the-job

injury; (3) medical treatment which put her employer on notice that treatment had been

rendered for a work-related injury; and (4) consequent termination.  Blackwell v. Shelter

Mut. Ins. Co., 109 F.3d 1550, 1554 (10th Cir. 1997), citing Buckner v. General Motors

Corp., 760 P.2d 803, 806 (Okla. 1988).[31]  SAH challenges plaintiff's ability to establish a

---

[31]*If an employee makes her initial showing, the employer then must articulate a legitimate,
nonretaliatory reason for the discharge.  If the employer rebuts the inference that its motive was
retaliatory,  the employee must establish that she has been the victim of retaliatory discharge either
directly by showing "the discharge was significantly motivated by retaliation for her exercise of
statutory rights, or indirectly by showing that the employer's proffered explanation is unworthy of*

prima facie case of retaliatory discharge, citing a lack of evidence that her termination was significantly motivated by her workers' compensation claim.

While the first three elements of plaintiff's prima facie case are not in dispute, the fourth is the stumbling block.  As construed by the Oklahoma courts, the requirement of "consequent termination" imposes a burden on a plaintiff to "produce evidence sufficient to support a legal inference that the termination was 'significantly motivated' by retaliation for exercising her statutory rights." Blackwell, 109 F.3d at 1554 (quoting Wallace v. Halliburton Co., 850 P.2d 1056, 1058 (Okla. 1993)).  "Although a plaintiff need not meet a 'but for' standard, she must present evidence that does more than show the exercise of her statutory rights 'was only one of many possible factors resulting in [her] discharge.'" Id. (quoting Wallace, 850 P.2d at 1059).  Here, plaintiff has offered nothing to link her work-related injury to her termination other than temporal proximity.  The Oklahoma Supreme Court rejected a workers' compensation claim that was based on nothing more than timing in Thompson v. Medley Material Handling, Inc., 732 P.2d 461 (Okla. 1987), stating:

> Taking this testimony in the light most favorable to Thompson it fails to do anymore to connect his termination to the filing of the Workers' Compensation claim than to establish that the two events happened approximately six weeks apart. He does not even allege that his supervisors or others at any time made any reference regarding termination as a result of bringing the Workers' Compensation action.  From the evidence presented nothing can be legally inferred. The reasons for Thompson's discharge, other than those stated by appellee [employer], could only be deduced by pure speculation. Such evidence could not support the presentation of the matter to a jury. To hold otherwise would be to require any employer laying off a worker who has at

credence." Buckner, 760 P.2d at 807.

> any time in the past filed a Workers' Compensation action to submit to a jury trial based purely on the coincidence of the layoff and the past filing.

*Id.* at 464.

A similar conclusion was reached by the Tenth Circuit in <u>Blackwell</u>. The plaintiff in <u>Blackwell</u> sued her former employer alleging she had been discharged for filing a workers' compensation claim. The plaintiff had injured her back at work, returned to her job and, about a year and a half later, was fired approximately six weeks after she told her supervisor her back was still causing her trouble. The district court granted summary judgment in the defendant's favor, as he concluded the plaintiff had not presented sufficient evidence to establish the consequent termination element of her prima facie case. The plaintiff's evidence of retaliatory motive included the feeling she got when she first injured her back from her supervisor's "mannerism" that he did not want her "on workers' compensation" and her belief that "other adjusters implied to her that her job would be in jeopardy if she did not return to work." *Id.* at 1551. She also claimed another employee told her he did not believe he was treated fairly after he filed a workers' compensation claim. *Id.* The Tenth Circuit agreed with the trial court that the plaintiff had "simply failed to establish a nexus between her termination and any protected activity on her part." *Id.* at 1556. The court noted that, as in <u>Taylor v. Cache Creek Nursing Centers</u>, 891 P.2d 607, 610 (Okla.Civ.App. 1994) and <u>Thompson</u>, 732 P.2d at 464, there was no evidence that Blackwell's employer, Shelter Mutual, "engaged in a pattern of terminating or otherwise discriminating against employees who engaged in protected activity under Oklahoma's Workers' Compensation Act."

Blackwell, 109 F.3d at 1555. Also, despite her long tenure with the company Ms. Blackwell had no evidence of "any Shelter Mutual employee, other than herself, who was terminated for initiating a workers' compensation action" and could "refer to only one employee, other than herself, who believed he was treated unfairly for filing a workers' compensation claim." *Id.* Finally, while there was no evidence that Shelter Mutual sought to prevent Ms. Blackwell from filing a workers' compensation claim, there was evidence that the company had repeatedly encouraged her to seek medical treatment for her injury.

Many of the same circumstances are present here. Plaintiff has not shown that SAH systematically terminated employees or even terminated even one other employee after they sustained an on the job injury. She offered no evidence that she was discouraged from reporting the accident or that anyone at SAH said anything negative about the fact that she had been injured.

The court recognizes that the timing here was closer than the sequence in Thompson. Plaintiff's claim is based on her being injured on the job in early February 2009.[32] However, while "timing of a discharge may be evidence of a retaliatory discharge ... it does not establish a prima facie case." Gussa v J. Morris and Assocs., Inc., 12 P.3d 473, 474 (Okla.Civ.App. 2000) (citing Wallace v. Halliburton, 850 P.2d 1056 (Okla. 1993)); *see* Taylor, 891 P.2d at 610 (fact that plaintiff "was fired immediately after returning from a two-week, doctor-ordered disability leave ... in itself does not raise a legal inference that the

---

[32]*She was off work and then returned to work with a light duty restriction that was lifted two days before she was terminated.*

firing was significantly motivated by retaliation."). Under the circumstances present here, including that plaintiff was terminated approximately two weeks after the OCA report was issued on March 4, 2009, the court finds plaintiff has failed to make a prima facie showing of retaliatory discharge. Therefore, defendant is entitled to summary judgment on plaintiff's workers' compensation retaliation claim.

<u>Tortious Interference with Business Relations</u>

Plaintiff's remaining claim is based on allegations defendant tortiously interfered with her prospective business relations. She alleges in her complaint that she interviewed for a position with the OU Medical Center and, while en route to a physical and drug screening for the position, was called by the person with whom she had interviewed. She alleges he told her that her application was rejected because he had talked to defendant and plaintiff had been given a bad reference. Complaint, p. 6.

"In Oklahoma, tortious or malicious interference with a contract has the following elements: (1) 'a business or contractual right with which there was interference;' (2) 'the interference was malicious and wrongful, and that such interference was neither justified, privileged nor excusable;' and (3) 'damage was proximately sustained as a result of the complained-of interference.'" <u>Anderson v. Suiters</u>, 499 F.3d 1228, 1238 (10th Cir. 2007) (quoting <u>Morrow Dev. Corp. v. Am. Bank & Trust Co.</u>, 875 P.2d 411, 416 (Okla.1994)). Defendant argues plaintiff has offered no evidence to support her claim other than inadmissible hearsay – her own testimony that she was told that her interviewer "called St. Anthony and the reference wasn't good." Plaintiff's Exhibit 1, p. 305. Plaintiff does not

respond to defendant's argument, asserting instead that material fact questions exists as to "whether Defendant has provided evidence of a 'proper purpose' in giving Plaintiff a bad reference," and "whether Plaintiff has provided adequate evidence of Defendant's unjustifiable act, i.e. giving Plaintiff a bad reference." Plaintiff's response, p. 22. In the absence of admissible evidence of interference by defendant, plaintiff has no tortious interference claim. Defendant is entitled to summary judgment on plaintiff's tortious interference claim.

Based on the record and the parties' pleadings and briefs, the court concludes plaintiff has failed to submit sufficient evidence to warrant submission of any of her claims to a jury. Accordingly, defendant's motion for summary judgment [Doc. #49] is **GRANTED** in its entirety.

**IT IS SO ORDERED**.

Dated this 8th day of April, 2011.

JOE HEATON
UNITED STATES DISTRICT JUDGE